Filed 7/10/15  In re Baby Girl G. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re BABY GIRL G., a Person Coming Under the Juvenile Court Law. | B259249 |
| | (Los Angeles County Super. Ct. No. CK80102) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| VIVIAN G., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County,
Sherri Sobel, Referee.  Affirmed.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and
Appellant.

Amir Pichvai for Plaintiff and Respondent.

_____

## INTRODUCTION

Mother appeals the juvenile court's finding at the six-month review hearing that the Department of Children and Family Services (DCFS) provided Mother with reasonable services pursuant to Welfare and Institutions Code[1] section 395. Mother argues that DCFS failed to provide her with sufficient visitation with her daughter, Darlene, and guidance and support to engage in her case plan. We affirm the trial court's finding of reasonable services as it was supported by substantial evidence.

## FACTS AND PROCEDURAL BACKGROUND

In July 2013, then eighteen-year-old Mother gave birth to Darlene. On July 6, 2013, DCFS responded to a referral that Mother was behaving erratically while giving birth at the hospital and detained Darlene based on Mother's history of mental health problems and drug abuse. Although Mother tested negative for illegal drugs at Darlene's birth, Mother admitted to DCFS that she used methamphetamine five or six times when she was pregnant. Mother also informed DCFS that she had been diagnosed with bipolar disorder and depression, and did not receive prenatal care. At that time, Mother was a dependent of the juvenile court, who had left her placement to live with her boyfriend, Darlene's Father. In addition, when Mother was 14 years old, Mother previously gave birth to and lost custody of another child as a result of domestic violence and that father's drug abuse. Mother's parental rights to her first child were terminated in 2011 after Mother failed to reunify.

On July 10, 2013, DCFS filed a juvenile dependency petition against Mother, pursuant to section 300, subdivision (b). The court conducted an arraignment and detention hearing, and ordered Darlene to be detained from both parents. Darlene was placed in the home of Mother's maternal cousin, Crystal.

---

[1]     All subsequent references are to the Welfare and Institutions Code, unless otherwise indicated.

Shortly thereafter, in July 2013, Mother was hospitalized at Aurora Charter Oaks Hospital, diagnosed with Paranoid Schizophrenia, and placed on psychotropic medication. In an August 2013 conservatorship proceeding, the superior court found that Mother was gravely disabled and appointed the public guardian as Mother's conservator in charge of Mother's residential placement, psychiatric care, medication management, and estate. Mother remained hospitalized at Aurora until February 2014, receiving mental health treatment. While at Aurora, DCFS met with Mother and provided her with a list of referrals for parenting, individual counseling and drug rehabilitation programs in August 2013. As a locked facility, Aurora could not facilitate visits between Mother and Darlene. Visits were particularly difficult because Mother's behavior at Aurora was reportedly "inconsistent due to her mental health" and the facility had concerns that it could not ensure Darlene's safety during visits. On several occasions, the social worker herself transported Darlene and other relatives to Aurora for a visit with Mother. From the time DCFS took custody of Darlene in July 2013 until December 2013, Mother had four visits with Darlene. Mother nonetheless called Darlene's caregiver, Crystal, regularly to check in on Darlene. Mother had two additional visits with Darlene in early 2014 at Aurora.

On February 27, 2014, the juvenile court sustained allegations within the dependency petition that Mother's history of substance abuse rendered her incapable of providing regular care for Darlene, that Mother used methamphetamine while pregnant with Darlene, and that Mother's history of mental and emotional problems placed Darlene at risk of physical harm and damage. DCFS removed Darlene from Mother's custody, and ordered Mother to engage in a drug treatment program, a parenting education class, and mental health counseling. The court also ordered Mother to have at least two weekly three-hour visits with Darlene at her residential facility. On the day of the jurisdictional hearing, the social worker reported that she had arranged for Mother to have monitored visits with the child once per week at Aurora (the maximum permitted by the hospital).

3

The next day, February 28, 2014, Mother was moved to Meadowbrook Manor, another locked facility. During the ensuing four months at Meadowbrook, Mother took her prescribed medications, regularly attended group therapy, and engaged in psychiatric counseling. DCFS checked in with Mother's program manager to obtain progress reports regarding Mother's treatment. Although several visits occurred, many of Mother's visits with Darlene did not occur due to the lack of availability of a monitor, and due to the distance (approximately 70 miles) between Meadowbrook and Crystal's home, where Darlene was placed.

Mother's success at Meadowbrook led to her being moved to Pico Rivera Gardens, a lower-level-of-care facility in June 2014. Although Mother could not leave the facility during the first two weeks of her treatment at Pico Rivera, Mother was thereafter free to leave as long as she returned to the facility by her curfew time. In June 2014, shortly after her arrival at Pico Rivera, DCFS provided Mother with referrals for parenting classes and 12-step meetings, and encouraged her to proactively engage in her case plan. The social worker also explained to Mother that she was going to have to begin participating in random drug testing, as well as attend individual counseling, parenting, and drug counseling once she began transitioning back into the community. Mother agreed to contact the agencies for the parenting classes and Narcotics Anonymous meetings.

One month later, the social worker met with Mother and inquired whether she had made the initial calls for parenting classes and Narcotics Anonymous meetings. Mother indicated that she had not called because she did not know what to say. The social worker practiced with Mother what Mother should say when making the phone calls, and again encouraged Mother to call. The social worker also brought Darlene with her to this meeting so that Mother could visit with Darlene.

While at the Pico Rivera facility, Crystal welcomed Mother to visit with Darlene in her home, as long as Mother notified Crystal in advance of the visit. Although Mother reported to DCFS that she was going to do this and Mother was free to leave the facility to visit Darlene, Mother failed to follow through with making these arrangements. There was one occasion where Mother was in the city where Crystal lived, visiting the maternal

4

grandmother. On that occasion, Mother did not make an effort to visit Darlene. On a subsequent date, Mother called and cancelled a scheduled visit with Darlene because Mother decided to go to the beach with friends rather than visit her daughter.

At the August 13, 2014, six-month review hearing, Mother argued that she did not receive reasonable reunification services. The court found that Mother was in partial compliance with her case plan, that DCFS provided Mother with reasonable services, that the social worker had been very sensitive to Mother's needs, and that Darlene would likely be returned to Mother within six months of the hearing. DCFS recommended that Mother receive an additional six months of reunification services and continue to work on her case plan. The court continued Mother's reunification services and set a 12-month review hearing for January 2015.

## DISCUSSION

Mother's sole contention on appeal is that insufficient evidence supports the dependency court's finding that DCFS made reasonable efforts to (1) provide Mother with twice weekly visitation mandated by the juvenile court and (2) give Mother the guidance and support she needed to successfully engage in her case plan. We find no error.

Pursuant to section 366.21, subdivision (e), the statute governing six-month review proceedings, the court must determine whether the parent was provided or offered reasonable services. (§ 366.21, subd. (e).) The reasonableness of reunification services is judged according to the circumstances of the particular case and assessed by its two components: content and implementation. (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1362.)

Both the reasonableness of DCFS's efforts to provide services and the adequacy of those services are judged according to the circumstances of each case. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 690–691 (*Kevin R.*).) If, as in this case, the parent's mental illness is what brought the child into the dependency system, then mental illness is the starting point and "the reunification plan, including the social services to be provided, must accommodate the family's unique hardship.' [Citation.]" (*In re K.C.* (2012) 212 Cal.App.4th 323, 333.)

5

"To support a finding reasonable services were offered or provided, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . .' [Citation.]" (*Kevin R., supra,* 191 Cal.App.4th at p. 691; *In re K.C., supra,* 212 Cal.App.4th at pp. 329–330 [same].) To be reasonable, the services provided need not be perfect. " 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' [Citation.]" (*Kevin R.,* at p. 692.)

We review the dependency court's reasonable efforts finding for substantial evidence. (*Kevin R, supra,* 191 Cal.App.4th at p. 691; *In re H.E.* (2008) 169 Cal.App.4th 710, 725.) Under this standard, we "must view the evidence in a light most favorable to the respondent. We must indulge in all legitimate and reasonable inferences to uphold the verdict. If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed. [Citations.] ' " '[W]hen two or more inferences can reasonably be deduced from the facts,' either deduction will be supported by substantial evidence, and 'a reviewing court is without power to substitute its deductions for those of the trial court.' [Citations.]" [Citation.]' [Citation.]" (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.)

Mother argues that DCFS "failed to provide [M]other with reasonable reunification services. Mother did not receive anything like the twice-weekly monitored visits mandated by the juvenile court. . . . [DCFS] did not provide [M]other with the guidance and assistance she needed to secure and engage in services." Yet, Mother's arguments fail to take into account the circumstances of her case. Between July 2013 and June 2014, Mother was under mental health conservatorship and resided at inpatient mental health facilities to address her serious mental health problems. These facilities provided her with services like therapy, psychotropic medication, group counseling, and programs that ranged from drug counseling to learning how to be independent, all of which were

6

essential to Mother regaining her independence and ability to parent Darlene. Considering Mother's mental health history and Mother's erratic behavior during Darlene's birth, mental health treatment and stability were the most crucial elements of Mother's case plan without which Mother would have been unable to make any progress in the other components of her case plan. It was under the supervised, protected and structured environment of these facilities that Mother was able to progress and step down to a lower level of care.

DCFS workers functioned within the structure created by Mother's conservator to treat Mother's mental health issues in the year following Darlene's initial detention. In that regard, social workers actively remained in regular contact with Mother, her case managers at the treatment facilities, and her conservator. DCFS workers arranged for Mother's visits with Darlene to the extent feasible in the context of each treatment facility's rules, the distance between Darlene's placement and the facilities, and the availability of visitation monitors. Contrary to Mother's assertion, DCFS's inability to adhere to the court's visitation orders does not amount to lack of reasonable efforts under the facts of this case.

Section 362.1, subdivisions (a)(1)(A) and (B), state that visits with parents should be "as frequent as possible, consistent with the well-being of the child," and "[n]o visitation order shall jeopardize the safety of the child." Mother was living in a series of mental health treatment facilities with rigorous restrictions regarding visitation. As Mother's conservator noted, once Mother was transferred to a locked facility, the facility could not facilitate any visits due to concerns regarding Darlene's safety. The distance between Mother's facilities and Darlene's placement hindered visitation, especially after Mother was moved to Meadowbrook Manor. That a monitor was needed for the visits and that Mother's facilities did not provide for monitors further complicated visitation. Despite these challenges, the social worker attempted to facilitate visitation by transporting Darlene to and from Mother's facility and monitoring visitation. In addition, beginning in early July 2014, Mother had the ability to visit Darlene on a daily basis while living at Pico

7

Rivera. Yet, Mother failed to do so, instead opting on different occasions to go to a casino in San Diego or to the beach.

Furthermore, when it was finally feasible to have Mother become involved in parenting classes and other programs prescribed by the juvenile court, DCFS provided Mother with information to contact those programs. The social worker was careful not to overwhelm Mother with many programs and responsibilities. Rather, the social worker started small, asking Mother to make a few calls to locate a parenting program and a Narcotics Anonymous chapter near her. The social worker followed up with Mother the next month and after learning that Mother failed to make the phone calls, the social worker practiced with Mother what to say on the phone to these providers. This guidance and supervision of Mother amounts to reasonable efforts.

Mother likens her circumstances to *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, where the juvenile court erroneously terminated the mother's reunification services and set a section 366.26 hearing. There, the court concluded that there was insufficient information in the record regarding DCFS's efforts to facilitate visitation during the mother's hospitalizations for mental health problems. (*Id*. at 1791.) The court noted that visitation "may or may not be reasonable depending on the rules and regulations of the institutions involved, the condition of the parent, and the distance from the children's placement." (*Id*. at 1792.) The court explained that the "record should clearly reflect, however, the basis upon which a special needs parent is denied the opportunity to maintain visitation and an ongoing relationship with his or her child." (*Ibid*.) In contrast to *In re Elizabeth R.*, the record in the present case clearly reflects that Mother's visitation was inhibited by the rules of the mental healthcare facilities, Mother's own mental health status, the distance between Darlene's placement and Mother's facilities, and the availability of a monitor for the visitation. Substantial evidence supports that the limited visitation that Mother received was reasonable under these circumstances.

8

Mother also cites *In re K.C, supra,*. 212 Cal.App.4th 323, and *In re Taylor J.* (2014) 223 Cal.App.4th 1446, in support of her argument that DCFS failed to provide reasonable services. In *In re K.C.*, the child protective services agency failed to follow through in any meaningful way on a psychologist's recommendation that the father, who suffered from a significant mental illness, be assessed for psychotropic medication. (*In re K.C,* at p. 329.) The medication evaluation was of particular importance due to the court's finding that the father's failure to cooperate and engage in services was a product of his mental illness, which may be responsive to medication. (*Id.* at p. 330.) Similarly in *In re Taylor J.*, the child protective services agency failed to provide the mother with reasonable reunification services. The court there concluded: "Family reunification services are not 'reasonable' if they consist of nothing more than handing the parent a list of counseling agencies when the list contained the name of only one domestic violence victim counseling agency in proximity to [the m]other's home. Furthermore, although [the m]other was ordered to participate in individual counseling, the list did not contain the names of individual counseling agencies." (*In re Taylor J.,* at p. 1452.)

Both *In re K.C.* and *In re Taylor J.* fail to support Mother's arguments as the record in this case indicates that DCFS made reasonable efforts to help Mother obtain mental health and other services. Mother's mental health needs were clearly addressed from the very beginning of this case as Mother entered the care of multiple mental health facilities, receiving counseling, therapy, and psychotropic medications. Contrary to Mother's assertions, the fact that the social worker had Mother make the initial phone calls to parenting class providers and Narcotics Anonymous organizations in no way likens this case to *In re K.C.* or *In re Taylor J.* Here, DCFS checked in with Mother periodically, and assisted Mother further in accessing these services by practicing with Mother what to say to the providers. DCFS actively assisted Mother in obtaining visitation by driving Darlene to visits when feasible, monitored Mother's mental health rehabilitation progress, and connected her with relevant services. DCFS did not neglect Mother's needs, as the agencies in *In re K.C.* and *In re Taylor J.* did to those parents.

Based on the foregoing, we conclude that there is substantial evidence that DCFS identified the problems leading to Mother's loss of custody, offered services designed to remedy those problems, maintained reasonable contact with Mother during the course of the service plan, and made reasonable efforts to assist Mother to meet her mental health needs. We therefore affirm.

## DISPOSITION

The juvenile court's finding of reasonable efforts is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, Acting P. J.

We concur:

ALDRICH, J.

EGERTON, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.